UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ESPOT, INC.                              §
                                         §
v.                                       §    CIVIL NO. 4:19-CV-954-SDJ
                                         §
MYVUE MEDIA, LLC, ET AL.                 §

## **MEMORANDUM OPINION & ORDER**

Parents managing a child's extracurricular schedule know that it can be tedious and fraught. Parents of children that play youth sports—with all the attendant practices, paperwork, tournaments, and fundraising—know this all too well. Plaintiff ESPOT, Inc. ("ESPOT") aimed to alleviate this problem by creating a free digital-media product that its principals, Mike Valley and Brad Cohen, hoped would streamline communication between the coaches and the families of student athletes. The product they created, a tablet called "TeamTab," would contain timely, team-specific information about schedules and other team obligations. ESPOT could then leverage the platform to generate advertising revenue by selling targeted digital advertising space to display on the tablets.

As ESPOT attempted to launch its product, it sought the contacts and expertise of those outside the business, including Defendants Joe Clemente, Kevin Carpentier, and Andrew Moskowitz. All appeared enthusiastic about the company's prospects when ESPOT sent Clemente 150 tablets to place with families, anticipating that these would be the first of thousands of tablets to go into homes across the country. Then the lights went out on the venture. ESPOT alleges that, having

1

conspired together to do so, Defendants David Drucker, Thomas Weddell, Joe Clemente, Andrew Moskowitz, and Kevin Carpentier (collectively, the "Individual Defendants") extracted the trade-secret source code from tablets Clemente enticed ESPOT to send. ESPOT also alleges that the Individual Defendants misappropriated ESPOT's client lists and financial projections, which they used in creating and marketing their own tablet product as part of a business plan with Defendants MyVue Media, LLC ("MyVue") and NexxGen News, LLC ("NexxGen") (collectively, with the Individual Defendants, the "MyVue Defendants").

ESPOT filed this lawsuit against the MyVue Defendants, asserting a civil violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO") and RICO conspiracy under 18 U.S.C. § 1962, *et seq.*, misappropriation of trade secrets under 18 U.S.C. § 1836, *et seq.*, and violation of the Computer Fraud and Abuse Act ("CFAA") under 18 U.S.C. § 1030*, et seq.* ESPOT also alleges aiding and abetting and conspiracy against all the Individual Defendants, breach of fiduciary duty against Defendants Moskowitz, Carpentier, and Clemente, and conversion against Defendant Clemente.

ESPOT moved for a temporary restraining order and preliminary injunction on the misappropriation-of-trade-secrets and breach-of-fiduciary-duty claims. (Dkt. #22). The MyVue Defendants responded in opposition, (Dkt. #27), to which ESPOT replied, (Dkt. #29). Contemporaneous with briefing on the preliminary injunction, the MyVue Defendants filed a motion to dismiss for lack of personal jurisdiction as to all defendants under Federal Rule of Civil Procedure 12(b)(2) and

for failure to state a civil RICO claim under Rule 12(b)(6). (Dkt. #25). ESPOT responded in opposition, (Dkt. #35), to which the MyVue Defendants replied, (Dkt. #43). ESPOT filed an additional sur-reply. (Dkt. #44). In this order, the Court addresses the motions to dismiss. The preliminary injunction will be considered in a separate order.

After a telephonic conference with the parties, the Court determined that ESPOT's motion would be considered a preliminary-injunction motion and not a motion for temporary restraining order. (Dkt. #23). The Court also held two additional hearings regarding both the preliminary-injunction motion and the motions to dismiss, at which Mike Valley and Robert Hirano testified. (Dkt. #37, #45).

The nature of the motions to dismiss and the claims alleged requires that the Court address the motions in an unusual order. The Court cannot rule on the 12(b)(6) motion to dismiss the RICO claims unless it first determines that it has personal jurisdiction over the defendants as to those claims. *See Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (A . . . motion for lack of subject matter [or] personal jurisdiction must be considered by the district court before other challenges . . . ."). But because ESPOT urges the Court to exercise pendent personal jurisdiction over the defendants with respect to the remaining non-RICO claims, personal jurisdiction as to these claims depends on whether the RICO claims survive the 12(b)(6) motion.

The Court concludes that it has personal jurisdiction over every defendant with respect to the RICO claims. However, the Court further concludes that ESPOT has

failed to plead a valid civil RICO claim or conspiracy. Unable to exercise pendent personal jurisdiction based on the RICO claims, the Court concludes that it has personal jurisdiction only over Defendant Clemente with respect to the remaining claims. The Court therefore **GRANTS in part** and **DENIES in part** the Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. The Court further **GRANTS** the Rule 12(b)(6) motion to dismiss the civil RICO claims.

## I. BACKGROUND

### A. The ESPOT Business

Mike Valley and Brad Cohen, co-founders of ESPOT, began their business selling a digital advertising and communication product to sports facilities. That product is a dedicated screen that communicates relevant information to sports-facility patrons while intermittently rolling through short video advertisements—an idea that combined a helpful locker room feature from Valley's days as a professional hockey player and coach with advertising revenue. That idea led to another—to take the attributes of ESPOT's sports-facility product and put it in tablet form. Rather than providing information about a sports facility, the "TeamTab" tablet, which ESPOT began developing in early 2019, would be available for free to allow teams to communicate information and responsibilities with players and their families. Then, like the facility product, the tablet would also facilitate programmatic advertising.

Despite the simplicity of the concept, execution was more difficult. The tablet ESPOT uses, a retail item, does not function properly for ESPOT's purposes right out of the box. It must be programmed using server-side software to input content, kiosk

4

software to strategically limit functionality, and programmatic advertising—small video clips—to provide the seamless user interface that is intended. Valley claims that figuring out the "TeamTab" configuration recipe—how to get each of these components to work together and run smoothly—took him and Cohen hundreds of hours. Once the settings were established, however, Valley was able to create a "JSON" file that saved the kiosk software settings, making them easily portable from device to device. (Dkt. #37, Hr'g Tr. vol. 1 79:6–16). ESPOT contends that the contents of the JSON file, along with the server-side software customizations, are a trade secret because of the value derived from the time and effort taken to create the setting configuration.

Around the time that Valley was creating the TeamTab, ESPOT brought on Defendant Andrew Moskowitz, a New Jersey resident, to help with advertising sales. In his role, Moskowitz had access to sales presentations, contracts, and pricing information. (Dkt. #37, Hr'g Tr. vol. 1 65:2–24). Kevin Carpentier, a New York resident, followed shortly after, at the suggestion of Moskowitz, to help with sales of ESPOT's original product to sports facilities. In this role, Carpentier had access to "Streak" which is software that helps businesses manage their customers, leads, and sales presentations. (Dkt. #37, Hr'g Tr. vol. 1 66:14–25). Carpentier then recommended another New York resident, Joe Clemente, who owned a customer sports facility, as a person who could sell ESPOT's sports-facility product through his extensive professional network. Moskowitz also connected ESPOT with Roger Hirano, based in Brazil, who was hired to develop a new "ad-stack," which is software

that allows companies to determine when and how digital advertisements are displayed. Though consulting agreements were drafted for Carpentier, Clemente, and Moskowitz, only Moskowitz signed one. None of the consultants knew about the TeamTab product initially, instead learning about it several weeks after coming on board. Once ESPOT had the TeamTab product ready, the next step was to get it into the hands of users.

Clemente, in particular, appeared excited about the idea and eager to help. He and Carpentier connected Cohen with Defendant Thomas Weddell, a New York resident and potential investor, in an unsuccessful attempt to raise capital. According to Weddell, Cohen sought a $400,000 investment and presented limited financial information and a spreadsheet that did not contain detailed financials or projections. (Dkt. #25-7, Ex. C ¶¶ 7–9). Weddell claims that Cohen did not follow up after the phone call and that he did not invest in ESPOT.

Clemente also reached out to Valley directly, initiating text-message conversations on May 4, 2019, and May 6, 2019. (Dkt. #35-1, Ex. A-1 at 1–2). In the May 6 conversation, Valley mentioned that he was busy trying to get tablets "out the door," and asked Clemente to "[s]tart thinking about what teams" might be good candidates for tablets. (Dkt. #35-1, Ex. A-1 at 3). Clemente responded that he needed to know how many teams because he "ha[s] unlimited resources throughout the entire country." (Dkt. #35-1, Ex. A-1 at 3). When Valley responded that ESPOT would have to "launch methodically," Clemente asked for a phone call. (Dkt. #35-1, Ex. A-1 at 4).

6

Clemente spoke with Valley by phone later that day. On the call, Clemente touted his connections with various sports leagues, including World Class Soccer and the state coaches' associations in approximately 30 states, including Florida and Georgia, and his ability to have an immediate audience with decision makers in those organizations. (Dkt. #36, Ex. 4). When Valley asked him, "How many families do you think we could get [signed up] in a month?", (Dkt. #36, Ex. 4), Clemente responded that "I think we could do easily 20,000, maybe more," (Dkt. #36, Ex. 4). Clemente suggested that certain leagues, like World Class Soccer, would not require any convincing to sign on with ESPOT because of Clemente's relationships with leaders in those organizations. *See* (Dkt. # 36, Ex. 4) ("I can walk up to [my World Class Soccer connection] and be like 'hey listen, we're putting this in every team,' and he'll be, like, 'Done. It's done.'"). When Valley noted that putting tablets with teams in the near term would be helpful to demonstrate scale to attract additional investors, Clemente responded, "We're ready . . . You just tell me." (Dkt. #36, Ex. 4). Valley then asked him, "Can you have 150 families ready for me next week if I get you 150 tablets?" Clemente replied, "Done. Done deal." (Dkt. #36, Ex. 4). Valley later followed up by Telegram, a chat application, asking if the following week was "a reality," to which Clemente responded, "Absolutely . . . I will never BS you. If I say we can get it done…..[sic] We Get It Done!" (Dkt. #35-1, Ex. A-1 at 5).

According to Valley, because he believed Clemente, he "decided to do whatever was necessary to ensure Joe Clemente received 150 TeamTab tablets as quickly as possible." (Dkt. #35-1, Ex. A ¶ 36). Additional evidence demonstrates that on

May 16, 2019, Clemente reached out again to ask where his tablets were, and Valley referred him to Cohen. (Dkt. #25-10, Ex. E ¶ 19). Cohen shipped the tablets from Massachusetts on May 22, 2019. (Dkt. #25-10, Ex. E ¶¶ 20–21). At the hearing, Valley confirmed that ESPOT actually sent the tablets to Clemente in batches. (Dkt. #37, Hr'g Tr. vol. 1 74:5–7; 81:3–7). After the first batch of tablets arrived, however, ESPOT made a change that required an update to the settings. To save time, ESPOT had Carpentier pick up the tablets from Clemente so that they could "walk [Carpentier] through how to make those changes." (Dkt. #37, Hr'g Tr. vol. 1 81:9–15). ESPOT then gave Carpentier the administrative password, which allowed him to access the JSON file and other "behind the scenes" information so that he could make the settings changes before returning them to Clemente. (Dkt. #37, Hr'g Tr. vol. 1 81:16–21).

## B. The Alleged MyVue Conspiracy

ESPOT alleges that, at some point in late May 2019, Clemente, Carpentier, Moskowitz, and Weddell joined with David Drucker, the CEO of NexxGen News,[1] and Hirano to "duplicate the espot [sic] business." *See* (Dkt. #36-3 at 36) (noting that Moskowitz had shared with Hirano that he intended to duplicate the ESPOT business in the week prior to May 31, 2019). Hirano testified that Moskowitz asked him to "try

---

[1] NexxGen News produced an educational news show that included content for students that Drucker claims is no longer operating. (Dkt. # 27-6, Ex. B ¶ 19). ESPOT believes that Drucker's claim is inaccurate and contends that NexxGen partnered with MyVue after MyVue obtained ESPOT's intellectual property and that NexxGen intends to use a similar platform. (Dkt. #45, Hr'g Tr. vol. 2 244:20–25). Drucker was allegedly familiar with Clemente through his involvement with Clemente's sports facility and with Weddell as a NexxGen investor. (Dkt. #1 ¶¶ 44–45).

to replicate the ESPOT business into a new company using the same technology."
(Dkt. #37, Hr'g Tr. vol. 1 106:14–21).

The evidence reveals that, over the following days, the MyVue Defendants
discussed in a private group chat their intention to have Hirano look at a
"preconfigured" tablet—meaning one of the ESPOT tablets—so that he would "know
exactly what needs to get done and how to do it." (Dkt. #36-2 at 5). Clemente
confirmed that he had the preconfigured ESPOT tablets that could be sent to Hirano.
(Dkt. #36-2 at 6) ("I have all these tablets on me from Espot [sic]."). Moskowitz
additionally explained in the chat exactly how to configure the tablets and provided
the group with the password. (Dkt. #36-2 at 10–12). Clemente then sent those tablets
to Hirano in Brazil where they arrived on June 21, 2019, subject to customs fees.
(Dkt. #36-2 at 74). Those fees required Weddell to wire money in addition to Hirano's
compensation for his work for MyVue, which Weddell did that same day. (Dkt. #36-2
at 74–75).

Once Hirano had the tablets, he attempted to look at the files per Moskowitz's
instructions to "have a full review of how/what/what [sic] we need to do to
duplicate/improve upon the set up of content/ads/urls [sic] needed etc." (Dkt. #36-2
at 82). When Hirano could not get into the tablet immediately, Carpentier reiterated
the password that would disable the kiosk software on the tablet, (Dkt. #36-2 at 85),
which Hirano understood to be the "admin code" that would allow him to access the
content and configurations of the tablet, (Dkt. #37, Hr'g Tr. vol. 1 115:13–23). Valley
confirmed at the hearing that the "admin code" would, in fact, provide this type of

9

access. (Dkt. #37, Hr'g Tr. vol. 1 81–82:22–1). Once he entered the password, evidence of the chat log indicates that Hirano was able to locate the file that contained the software. (Dkt. #36-2 at 86). Hirano, however, testified that, despite his intention to "hack" the tablet and his prior declaration that he had successfully done so, (Dkt. #22-2, Ex. B ¶ 23), he was not in fact able to do so. (Dkt. #37, Hr'g Tr. vol. 1 115:13–23).

Shortly after Hirano attempted to access the tablet, Moskowitz sent him a message asking if ESPOT had reached out to see if Hirano was working with MyVue. Although ESPOT had not asked, Moskowitz instructed him to "deny, deny, deny" if it did. (Dkt. #36-3 at 62). Hirano testified that, at that time, he believed ESPOT was aware of the MyVue Defendants efforts to duplicate ESPOT's company. (Dkt. #37, Hr'g Tr. vol. 1 111:1–4). Hirano also testified that, following this conversation, he realized "what we were doing [was] not fair" and decided to share all the information, including the texts, with Cohen. (Dkt. #37, Hr'g Tr. vol. 1 111:1–4). In response to the information provided by Hirano, ESPOT filed this lawsuit.

## II. RICO CLAIMS

The MyVue Defendants argue that this Court lacks personal jurisdiction over each defendant in this case. (Dkt. #25). ESPOT argues in response that if personal jurisdiction can be established over a single defendant, RICO's nationwide-service-of-process provision grants personal jurisdiction over all other defendants as to that claim, which will extend to the remaining claims via pendent personal jurisdiction. (Dkt. #35). The MyVue Defendants contend that RICO's nationwide-service-of-

10

process provision is unavailable here because ESPOT has failed to show that any defendant "resides, is found, has an agent, or transacts his affairs" in Texas, and that even if it had, ESPOT has not shown that the "ends of justice" require the exercise of personal jurisdiction over all defendants. (Dkt. #43 at 6). Finally, the MyVue Defendants assert that because the nationwide-service-of-process provision is embedded in the RICO statute, the failure of the RICO claim precludes the exercise of personal jurisdiction under its provisions. (Dkt. #43 at 8). The MyVue Defendants also ask the Court to dismiss the RICO claim because ESPOT fails to plead a pattern of racketeering activity and fails to plead the fraud predicates with sufficient particularity under Rule 9(b).

## A. RICO

### 1. Rule 12(b)(2) Motion

#### i. Service of Process

Normally, federal courts establish personal jurisdiction over defendants based on their minimum contacts with the forum state. *See infra* section II(A)(1)(ii). There are, however, exceptions, such as when cases are brought under a federal statute with a nationwide-service-of-process provision. *See Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1258 (5th Cir. 1994) (explaining that "sovereignty defines the scope of the due process test"—what the defendant must have minimum contacts with—when a federal statute provides for nationwide service of process).

The RICO statute provides for nationwide service of process. S*ee Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 918 (5th Cir. 1987) (analyzing

11

plaintiff's personal jurisdiction allegations under 18 U.S.C. § 1965). It states, in relevant part, that:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person *resides, is found, has an agent, or transacts his affairs.*

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that *other parties* residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

> (c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district . . .

> (d) *All other process* in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965 (emphases added).

Although the Fifth Circuit has yet to identify precisely which subsection of 18 U.S.C. § 1965 establishes that authority, *Rolls-Royce Corp. v. Heros, Inc.*, 576 F.Supp.2d 765, 779 (N.D. Tex. 2008), a majority of the circuit courts that have examined the issue have determined that it is section 1965(b) that confers nationwide service of process.[2] *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998) (holding that section 1965(b) confers nationwide service

---

[2] The Fifth Circuit, in applying the limitations of section 1965(a) to the plaintiff in *Caldwell* rather than conducting a national minimum-contacts analysis, appeared to tacitly endorse the majority approach. 811 F.2d at 918.

of process); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671 (7th Cir. 1987) (same); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538–39 (9th Cir. 1986) (same); *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1230–31 (10th Cir. 2006) (same); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1099 (D.C. Cir. 2008) (same). *But see Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) (identifying section 1965(d) as the statutory basis of RICO's nationwide service of process); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997) (same). The distinction is important because it implicates whether personal jurisdiction can be established over a defendant who merely has minimum contacts with the United States or if there is some prerequisite to nationwide service of process. *Compare Caldwell*, 811 F.2d at 918 (providing for nationwide service of process only after certain requirements are met), *with Busch*, 11 F.3d at 1258 (explaining that under a nationwide-service-of-process provision without a prerequisite, "the relevant inquiry is whether the defendant has had minimum contacts with the United States").

As the Second Circuit explained in *PT United Can*, section 1965 must be read as a whole to properly understand each constituent subsection, "particularly for the purpose of interpreting the terms 'other parties' and 'other process' in §§ 1965(b) and (d), respectively." 138 F.3d at 71. In so doing, the Second Circuit determined that section 1965(a) "grants personal jurisdiction over an initial defendant in a civil RICO case" if the defendant resides, has an agent, or transacts his affairs there, which the court interpreted to require a traditional minimum contacts analysis. *Id.* If this

13

threshold is met, section 1965(b) would then allow for nationwide service of process and personal jurisdiction over any other party, if it could be demonstrated that the "ends of justice" required it. *Id.* Section 1965(d) would then provide for "other" process not described in section 1965(c). *Id.* at 72. The Court finds *PT United Can*'s analysis persuasive. Accordingly, the Court must first determine whether there is at least one defendant who meets section 1965(a) before applying RICO's nationwide-service-of-process provision to the other defendants.

The MyVue Defendants contend that no defendant meets the requirements of 1965(a) because none are doing business in Texas. The defendants argue that *Caldwell* requires that a "defendant reside, be found, have an agent, or transact his affairs" in the forum to satisfy section 1965(a). 811 F.2d at 918. This is not the case. In *Caldwell*, the court noted that "[a] number of district courts" have found that language to require a defendant to "be conducting business in the forum." *Id.* The court then declined personal jurisdiction because it found that the facts in that case "establish[ed] that the defendants did not conduct business in Texas." *Id.* Nevertheless, the court's reasoning suggests that it engaged in a minimum-contacts analysis to arrive at its conclusion. *See id.* (noting that the letter sent to the plaintiffs and the plaintiffs' response was insufficient to "meet the statutory requirement"); *accord Domain Prot. LLC v. Keating*, No. 3:15-CV-2244-L, 2016 WL 5661649, at *3 (N.D. Tex. Sept. 30, 2016) (engaging in a minimum-contacts analysis under *Caldwell*); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 WL 11596564, at *2 (S.D. Tex. Feb. 3, 2010) (same); *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 605

14

(E.D. Tex. 1994) (same). Thus, so long as at least one defendant has engaged in sufficient minimum contacts with Texas related to the alleged RICO claim, its nationwide-service-of-process provision will grant personal jurisdiction over all other defendants when the "ends of justice" so require under section 1965(b).

The meaning of "ends of justice" is also unresolved in the Fifth Circuit. Some courts have followed *Butcher's Union*, which held that plaintiffs are required to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." 788 F.2d at 539; *see also Hawkins*, 890 F.Supp. at 605 (quoting the same language in its analysis of whether the *Caldwell* requires a minimum-contacts analysis). Others have followed *Cory*, which departed from *Butcher's Union* and declined to impose such a narrow construction of its meaning in light of the congressional directive to "liberally construe[ ] [RICO] to effectuate its remedial purposes," and noted its tension with the meaning of "the ends of justice" in other, similar contexts. 468 F.3d at 1231–32; *see also Rolls-Royce*, 576 F. Supp. 2d at 781–82 (following *Cory* and finding that the ends of justice required nationwide service of process after considering multiple factors).

The Court need not wade into the debate on this point because it is not apparent from the pleadings or the record that there is one forum that will certainly have personal jurisdiction over all defendants as to the RICO claim. *See* (Dkt. #25-7, Ex. C ¶¶ 3, 5, 14) (Weddell lives and works in New York, and there are no allegations of RICO-related minimum contacts with New Jersey); (Dkt. #25-8, Ex. B ¶¶ 3, 11) (Carpentier lives and works in New Jersey, and there are no allegations of RICO-

related minimum contacts with New York); (Dkt. #25-8, Ex. B ¶ 9) (NexxGen is incorporated in Delaware. Drucker asserts operations ceased prior to the allegations in the RICO claim, but that its principal place of business was in New York); (Dkt. #1 ¶ 3) (ESPOT alleges that NexxGen's principal place of business is in Florida and asserts that its website remains functional). Although the MyVue Defendants attempt to force the issue by offering up a judicial admission "to waive all objections to personal jurisdiction over ESPOT's claims if brought in the U.S. District of New Jersey or the U.S Southern District of New York," (Dkt #43 at 7), it would be antithetical to the purpose of a nationwide-service-of-process provision if defendants could escape it by simply colluding to waive personal jurisdiction in some other forum.

Allowing a promised waiver to defeat personal jurisdiction under these circumstances would effectively grant defendants the authority to veto a court's otherwise valid jurisdiction. It would also effectively give defendants under similar circumstances the power to select the forum. For example, defendants could simply promise to waive personal jurisdiction in a forum with more favorable law. RICO's broad nationwide-service-of-process provision cannot be defeated by a simple litigation tactic. Accordingly, the Court finds that, because there is no other jurisdiction that clearly has personal jurisdiction over every MyVue Defendant as to the RICO claim, the ends of justice require the exercise of personal jurisdiction over each of them, so long as minimum contacts with this jurisdiction exists as to one of them.

### ii. Due Process

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citations omitted). Unless there is an evidentiary hearing, a plaintiff must "present sufficient facts as to make out only a prima facie case supporting jurisdiction." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (citing *Felch v. Transportes Lar-Mex SA De CV*, 92 F.3d 320, 326 (5th Cir. 1996)). Once the plaintiff has established personal jurisdiction, the burden shifts to the defendant to present some reason that "would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

A federal court may exercise personal jurisdiction over parties in a case founded on federal-question jurisdiction when the federal statute "is silent as to service of process," if the exercise of jurisdiction meets federal constitutional requirements and the long-arm statute of the state in which the court sits authorizes it. *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1266 (5th Cir. 1983). Accordingly, absent a statutory mandate saying otherwise, a federal court "can assert jurisdiction only if the state court could have done so." *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1371 (5th Cir. 1986).

The Texas long-arm statute authorizes the exercise of personal jurisdiction to the limits of federal due process. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042

(authorizing jurisdiction over those "doing business" in Texas); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990) (citing *U-Anchor Advert. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)) ("This court has decided that the broad language of the long-arm statute's "doing business" requirement allows the statute to reach as far as the federal constitution permits."). Accordingly, the analysis under the Texas long-arm statute is identical to the federal constitutional analysis.

Due process is satisfied when a court finds that a defendant has "minimum contacts" with the forum state such that exercising personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *See Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 559, 62 L.Ed. 490 (1945)) (internal quotation marks omitted). The minimum-contacts requirement can be satisfied by conduct that gives rise to either general or specific jurisdiction. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867–68 (5th Cir. 2001) (citing *Alpine View*, 205 F.3d at 214).

General jurisdiction exists "where the defendant has 'continuous and systematic' contacts with the forum state." *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338, 342 (5th Cir. 2014) (quoting *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 368 (5th Cir. 2010)). For an individual, that place is their domicile; for a corporation, it is "an equivalent place, one in which [it] is fairly regarded as at home," usually the state of incorporation and the state in which the principal place of business is located. *Goodyear Dunlop Tires Operations,*

*S.A. v. Brown*, 564 U.S. 915, 924, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). When such jurisdiction over a party exists, he is amenable to suit in that state, even if the acts complained of did not arise there. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)) (noting that personal jurisdiction may exist based on sufficient contacts under general jurisdiction even if the cause of action did not arise in the forum).

Specific jurisdiction, on the other hand, relates the claims brought against the defendant and their relationship to the forum. Specific jurisdiction exists when (1) the defendant engages in "minimum contacts" that are "purposefully directed at the forum state," (2) there is a "nexus between the defendant's contacts and the plaintiff's claims," and (3) "the exercise of jurisdiction over the defendant [is] fair and reasonable." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012). Due process requires that "a defendant have sufficient contacts with the forum state such that it 'should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Such contacts should not be "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person," although "isolated or sporadic contacts" may suffice if the claim arises from them. *Id.* (first quoting *Burger King*, 471 U.S. at 475) (internal quotation marks and additional citations omitted).

If minimum contacts are established, courts may then consider whether the exercise of jurisdiction would be fair and reasonable. *Burger King*, 471 U.S. at 476.

19

To make that determination, "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies'" may be considered when appropriate. *Id.* at 477 (quoting *World-Wide Volkswagen*, 444 U.S. at 292). However, if minimum contacts have been established, a defendant "must present a compelling case that the presence of some considerations would render jurisdiction unreasonable." *Id.*

Although the MyVue Defendants challenge personal jurisdiction as to each defendant, ESPOT only presses personal jurisdiction over the RICO claim on the basis of actual contacts of Clemente, MyVue, and NexxGen. *See* (Dkt. #35 at 2–3) ("[T]he Court must address only the minimum contacts alleged against Defendants Joe Clemente, MyVue Media, *or* NexxGen News." (emphasis in original)). The MyVue Defendants assert that personal jurisdiction cannot be established over any defendant because all live and work outside of Texas and none of the acts ESPOT complains of occurred in or were directed at Texas. As confirmed in the briefing and at the hearing, ESPOT alleges only specific jurisdiction over the defendants. (Dkt. #37, Hr'g Tr. vol. 1 14:14–19). Accordingly, the analysis here is limited to specific jurisdiction. The Court finds that Defendant Joe Clemente had sufficient minimum contacts with Texas related to the alleged RICO claim to justify the Court's exercise of personal jurisdiction.

ESPOT has demonstrated a *prima facie* case for specific personal jurisdiction over Clemente.[3] As part of its RICO claim, ESPOT alleges that the MyVue Defendants engaged in mail and wire fraud as ESPOT consultants to obtain ESPOT tablets and trade-secret information in order to build a competing business. (Dkt. #1). Specifically, ESPOT alleges that Clemente participated in fraudulent acts in furtherance of the enterprise when he engaged in phone calls and text messages in which he made certain representations about his plans for the ESPOT tablets, including his intention to place them with families that participate in World Class Soccer.

These claims are supported by the evidence. *See e.g.*, (Dkt. #35-1, Ex. A-4 at 5) ("I would like to use them for these 10 Teams . . . ."); *id.* ("I will never BS you. If I say we can get it done….. [sic] We Get It Done!"); (Dkt. #36, Ex. 4) (phone call recording). Although these contacts are limited, they are significant to the wire and mail fraud alleged—the basis on which the RICO scheme is built—because Valley had the tablets sent to Clemente as a result of his representations. Therefore, the contacts are sufficient to confer personal jurisdiction. *See, e.g.*, *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 491 (5th Cir. 2018) (holding that a defendant who was "a willing

---

[3] A plaintiff must make a *prima facie* case for personal jurisdiction to survive a 12(b)(2) motion. *Walk Haydel & Assocs., Inc. v. Coaster Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). While a court can require a plaintiff to establish personal jurisdiction by a preponderance of the evidence, the court may only do so if it holds a hearing "where both sides have the opportunity to present their cases fully" and after both parties have "employ[ed] all forms of discovery . . . pertain[ing] to the personal-jurisdiction issue." *Id.* at 241–42. While the Court held two hearings in this case, both were early in the case and initially pertained to the preliminary-injunction motion. The parties had also not been permitted to pursue "all forms of discovery" on the personal-jurisdiction issue. *See id.* at 242. Accordingly, ESPOT must only present a *prima facie* case for personal jurisdiction.

participant on a conference call" and who "actively engaged in conversation" in which he made specific representations regarding his business to an individual that he knew to be in Texas had the requisite contacts with Texas to establish specific jurisdiction with respect to fraud); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").

Clemente contends that, despite sending communications to Valley, who Clemente knew was in Texas, his communications were directed, not at Valley individually, but at ESPOT, whose principal place of business is in Massachusetts. Clemente further points to the fact that the tablets at issue ultimately came from Brad Cohen in Massachusetts, not from Valley in Texas. Neither argument disturbs the Court's analysis.

Clemente suggests that, due to Massachusetts's being ESPOT's principal place of business, Clemente's communications with Valley were actually directed at Massachusetts despite the fact that Valley was in Texas. Even assuming that Clemente is correct that he was communicating with ESPOT rather than Valley, it is the defendant's contacts with the forum state itself that establish personal jurisdiction, not the defendant's contacts with the plaintiff. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 213 (5th Cir. 2016).

Clemente does not dispute that he had these communications with Valley, whom he knew to be in Texas and the co-founder of ESPOT, a Texas company.[4] *See*

---

[4] The Court takes judicial notice of ESPOT's Certificate of Conversion on file with the Texas Secretary of State in which ESPOT notes that its principal place of business is in

(Dkt. #25-10, Ex. E ¶ 25) (acknowledging communications with Valley, "who happened to reside in Texas"). Thus, personal jurisdiction does not arise because Valley "happen[s] to be from Texas," it arises because he was *in Texas* working in his capacity as a principal for a Texas LLC when the communications occurred. It was in those phone calls and messages transmitted into Texas that the alleged fraudulent misrepresentations giving rise to the cause of action occurred.

Clemente also argues that he had no more contacts with Texas than the defendant in *Wheel-Source, Inc. v. Gullekson*, No. 3:12-cv-1500-M, 2013 WL 944430, at *5–6 (N.D. Tex. Mar. 12, 2013). In that case, a Michigan defendant was in an independent-contractor relationship with a Texas company that alleged that the defendant had, among other things, misappropriated trade secrets and breached his fiduciary duties to the company when he wrongfully shared confidential information with his new employer in Quebec and the company's competitor in Ohio. *Id.* at *2. The *Wheel-Source* court held that personal jurisdiction did not exist over the defendant in Texas because his contacts with the forum were only superficially related to his independent-contractor relationship with the company and the conduct that gave rise to the alleged causes of action occurred elsewhere. *Id.* at *6–7. As noted above, however, whether personal jurisdiction exists over a nonresident defendant is a claim-specific inquiry. Indeed, what was missing in *Wheel-Source* is present here: conduct directed at Texas that forms the basis of the complaint; in this case, fraud.

---

Massachusetts. (Dkt. #43-1, Ex. F). The Court also notes that this document, filed on June 10, 2019, after the phone calls and messages at issue took place in early May, describes ESPOT as a Texas corporation following its conversion from Optica Ventures, a Texas LLC with an address in Frisco, Texas.

Because Clemente directed his allegedly fraudulent statements at Texas, this Court is justified in exercising personal jurisdiction over him on the RICO claims.

In an effort to rebut these jurisdictional facts, Clemente claims that he did not know that ESPOT was a Texas-based company, and he never expected that he would be haled into court in Texas over any dispute arising out of their relationship. (Dkt. #25-10, Ex. E ¶¶ 13, 25). Whether Clemente actually expected to be "haled into court" in Texas is not the relevant inquiry. Instead, the question is an objective one— whether one should reasonably anticipate being haled into court. One who makes affirmative representations over the phone to the Texas-based co-founder of a Texas company should reasonably anticipate facing suit in Texas based on claims arising out of those representations. *See Trois*, 882 F.3d at 491.

Although *Trois* involved an individual plaintiff, not a corporate one, it is the contact analysis that makes it particularly germane. In *Trois*, a Texas plaintiff asserted a fraud claim against an Ohio auction center on the basis of misrepresentations that its president, Schnaidt, made on phone calls initiated by a third party. *Id.* at 487–88. On those calls, Schnaidt, who knew the plaintiff was in Texas, made certain misrepresentations that formed the basis of the suit. *Id.* The court held that personal jurisdiction over the defendant company in Texas was appropriate because "[Schnaidt] was the key negotiating party who made representations regarding his business in a call to Texas" and it was "that intentional conduct . . . that led to [the] litigation." *Id.* at 491. Like the defendant in *Trois*, Clemente knew that he was speaking to Valley in Texas when he made the

representations at the root of this litigation. Clemente "should have reasonably anticipated being haled into [a] Texas court as a result." *Id.*

Finally, Clemente argues that because it was Cohen in Massachusetts who eventually sent him the tablets, he could not have fraudulently procured them as a result of his conversations with Valley. To prove his point, Clemente points to text messages with Valley in which Clemente asked about the tablets and Valley directed him to Cohen as well as a shipping receipt showing that the tablets were shipped from Massachusetts. (Dkt. #25-10, Ex. E ¶¶ 19–21). This sequence of events, however, does nothing to diminish the relevant contacts with Texas that have been alleged and demonstrated by the evidence. Clemente made representations over the phone to Valley, *whom he knew to be in Texas*, that Valley says induced him to send the tablets. The fact that Clemente later followed up with Valley about the tablets only serves to confirm that Clemente understood that he was dealing with Valley in this regard. *See* (Dkt. 25-10, Ex. E ¶ 20–21).

The Court concludes that Clemente's contacts with Texas through his phone calls and messages with Valley, in which he made specific representations about his willingness and ability to place the tablets with customers, constitute "some act by which the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum state." *Id.* (quoting *Burger King*, 471 U.S. at 475); *Trois*, 882 F.3d at 491. Accordingly, the Court finds that minimum contacts with Texas exist as to the RICO claim to justify exercising personal jurisdiction over Clemente. Although Clemente suggests that travel and expenses related to litigating the case

25

in Texas would be inconvenient or burdensome for him, the Court finds that they do not present a reason of constitutional magnitude to decline personal jurisdiction as unfair or unreasonable.[5]

Having determined that personal jurisdiction exists as to at least one of the MyVue Defendants, the Court will exercise personal jurisdiction over all the MyVue Defendants as to the RICO claim pursuant to its nationwide-service-of-process provision. Accordingly, the MyVue Defendants' motion to dismiss for lack of personal jurisdiction is DENIED as to the RICO claims.

## 2. Rule 12(b)(6)

Having established that personal jurisdiction exists over the MyVue Defendants as to the RICO claims, the Court will turn to ESPOT's motion to dismiss for failure to state a claim. (Dkt. #25). The MyVue Defendants challenge ESPOT's civil RICO claim for failure to plead a pattern of racketeering activity and for failure to plead the mail and wire fraud predicates with adequate particularity. (Dkt. #25). Because ESPOT fails to plead facts that demonstrate a pattern of racketeering activity, the RICO and RICO-conspiracy claims must be dismissed.[6]

### i. Legal Standard

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the

---

[5] Because personal jurisdiction exists at least as to Clemente, it is unnecessary to analyze MyVue and NexxGen's contacts with Texas regarding the RICO claims.

[6] Because the RICO claim must be dismissed for failure to plead a pattern of racketeering activity, the Court will not reach the MyVue Defendants' argument that ESPOT has failed to plead the mail and wire fraud predicates with sufficient particularity.

claim showing that the pleader is entitled to relief." Rule 9(b) requires that claims for fraud meet a higher standard, requiring a plaintiff to "state with particularity the circumstances constituting fraud." *See Van Velzer v. Amegy Bank*, 713 F. App'x 377, 378 (5th Cir. 2018) (per curiam) (unpublished) (citing *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)) (requiring a plaintiff to meet Rule 9(b) standards when pleading fraud as a RICO predicate, including the identity of the speaker, time, date, and place of the fraudulent statements). When a defendant contends that a plaintiff has failed to meet this standard, Rule 12(b)(6) provides a mechanism to challenge the legal sufficiency of a claim early in the litigation.

To survive a motion to dismiss brought under Rule 12(b)(6), a plaintiff must plead only "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

Although a probability that the defendant is liable is not required, the plausibility standard demands "more than a sheer possibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same

presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [its] claims . . . across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (first quoting *Twombly*, 550 U.S. at 570, then citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

### ii. Discussion

ESPOT asserts that the MyVue Defendants have worked together to engage in mail fraud, wire fraud, and theft of trade secrets as part of their common goal to "steal" ESPOT's business by obtaining its intellectual property and then marketing and distributing tablets containing the intellectual property, thereby threatening an indefinite pattern of criminal activity with each successive tablet that is delivered to a customer. The MyVue Defendants, however, contend that ESPOT's allegations fail to constitute a "pattern of racketeering activity" under 18 U.S.C. § 1962, maintaining that the criminal acts that ESPOT alleges, if true, ended when MyVue obtained the necessary tablets and trade secrets.

To establish a civil RICO claim under 18 U.S.C. § 1962, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A "pattern of racketeering activity" is defined by statute as "at least two acts

of racketeering activity." 18 U.S.C. § 1961(5). The list of criminal acts constituting "racketeering activity" encompasses dozens of criminal statutes, including 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1832 (theft of trade secrets). *Id.* § 1961(1). Although ESPOT has alleged more than two predicate acts, the Supreme Court has clearly explained that a RICO "pattern" involves something more. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ("In our view, Congress had a more natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates . . . .").

Instead, a pleading that sufficiently alleges a RICO "pattern" must include allegations that demonstrate both "relatedness" between the predicates and a threat of "continuing racketeering activity." *Id.* at 239–40 (emphasis omitted). Relatedness is established by showing that acts have the "same or similar purposes, results, participants, victims, or methods of commission." *Id.* at 240. The parties do not dispute that the alleged criminal acts undertaken by the MyVue Defendants are related, narrowing the inquiry to whether the alleged criminal acts constitute a threat of continuing racketeering activity.

The continuity aspect can be further conceptually divided into two distinct types—closed- and open-ended. *Id.* at 241 (citing *Barticheck v. Fid. Union Bank / First Nat'l State*, 832 F.2d 36, 39 (3d Cir. 1987)). A closed-ended pattern refers to a situation in which an enterprise has been engaging in related predicates over a long period of time. *Id.* at 242 (explaining that predicate acts "extending over a few weeks

or months" would not suffice to establish a closed-ended scheme); *see also Tel-phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992) (holding that seven months is insufficient to establish a closed-ended scheme). An open-ended pattern, on the other hand, has no strict temporal requirement. *See Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (quoting *H.J., Inc.*, 492 U.S. at 242–43) (explaining that an open-ended pattern relates to the threat of future repetition, not the length of time over which racketeering predicates have occurred). Plaintiffs seeking to establish an open-ended RICO pattern instead must show "either that the predicate acts establish a 'specific threat of repetition extending indefinitely into the future' or 'that the predicates are a regular way of conducting the defendant's ongoing legitimate business.'" *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Word of Faith*, 90 F.3d at 122).

Recognizing that the several weeks of activity complained of here is insufficient to establish a closed-ended pattern, ESPOT urges that it has alleged an open-ended scheme. (Dkt. #35 at 15). ESPOT claims that the MyVue Defendants have engaged in a multiplicity of predicate acts but focuses its open-ended-pattern argument on past and anticipated future trade secret misappropriation and mail and wire fraud allegations. (Dkt. #35 at 16–17). According to ESPOT, the MyVue Defendants intend to continue installing ESPOT intellectual property on MyVue tablets, exploiting ESPOT customer and advertiser information, and otherwise making use of ESPOT trade secrets. According to ESPOT, the "use" of a trade secret is an independent RICO predicate that occurs or will occur each and every time the MyVue Defendants

30

program or ship a tablet, contract with an ESPOT advertiser, or service a prospective ESPOT customer—and amounts to a regular way of conducting the MyVue Defendants' ongoing business. ESPOT contends that these same acts also constitute ongoing predicate acts of wire and/or mail fraud because they are in furtherance of a scheme to defraud.

ESPOT is mistaken.  Not only does ESPOT fail to plead actions that constitute predicate acts under RICO, but even it did, those acts fail to invoke a pattern of racketeering behavior within the meaning of the civil RICO statute. Because whether a "pattern of racketeering activity" has been pleaded is a legal question, the Court need not accept ESPOT's allegations that it has.

### a. ESPOT fails to allege RICO predicates.

ESPOT argues that "use" of a trade secret amounts to an independent predicate act each time a defendant employs what he or she has unfairly learned. ESPOT claims that when a MyVue Defendant reaches out to a prospective ESPOT customer, contracts with a potential advertiser, or ships a tablet that runs ESPOT's intellectual property, the enterprise engages in yet another RICO predicate. Because the MyVue Defendants plan to continue to operate their business by allegedly using ESPOT's trade secrets, ESPOT asserts that RICO predicates are a regular way of conducting business and present a specific threat of repetition in the future that is sufficient to state a RICO claim. Because the pattern of racketeering behavior ESPOT alleges hinges on the use of trade secrets as a regular way of conducting business, the claim rises and falls with the allegations of criminal acts that constitute RICO

predicates. If the threatened acts ESPOT alleges do not amount to RICO predicates, it fails to plead an open-ended pattern and cannot survive a motion to dismiss.

As noted above, the RICO statute lists with specificity the precise criminal violations that constitute racketeering activity. *See* 18 U.S.C. § 1961(1). Congress added theft of trade secrets to that list with the passage of the Defend Trade Secrets Act of 2016 ("DTSA"). *See* Defend Trade Secrets Act, Pub. L. No. 114-153, 130 Stat. 376. The RICO statute now defines racketeering activity as, among other things, "any act indictable" under 18 U.S.C. §§ 1831, 1832, which criminalizes theft of trade secrets. *Id.* § 1961(1)(B). At the same time, the DTSA established a private right of action for trade secret misappropriation in federal court. *See* DTSA § 1(b)(1).

ESPOT appears to understand the RICO predicate to be *any* federal cause of action that involves trade secrets or, perhaps, conflates the requirements of the civil and criminal statutes. *See* (Dkt. #44 at 5) ("Under the Defend Trade Secrets Act, a violation of which amounts to a predicate RICO act . . . ."). However, ESPOT cannot explain, nor do the cases cited in support of ESPOT's position support, how the civil cause of action in section 1836—which contains different language than that of the criminal statute—is incorporated into section 1961 as a RICO predicate. Without explanation as to how this portion of the statute is incorporated into RICO, the Court is unconvinced that it is.

The criminal theft of trade secrets statute, 18 U.S.C. § 1832, is violated when "[w]hoever, with intent to convert a trade secret . . . knowingly—

> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, upload, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization[.]

*Id.* § 1832(a)(1)–(3). Notably, section 1832, does not use the term "misappropriate" nor the term "use." To the contrary, the plain language of the statute appears to invoke the ways in which a person or entity can take or receive a trade secret, not use it once taken. *See United States v. Wen Chyu Liu*, 716 F.3d 159, 169–70 (5th Cir. 2013) (explaining that the government proves the substantive offense of theft of trade secrets by showing that, with the intent to convert, "the defendant knowingly *stole, copied, or received* trade secret information" (emphasis added)). If the criminal statute is limited to the point in time that a trade secret falls into unauthorized hands, then the ongoing use of the trade secrets once obtained cannot be a predicate act to establish a threat of continued criminal activity.

By contrast, the private right of action states that "[a]n owner of a trade secret that is *misappropriated* may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Id.* § 1836 (emphasis added). The term "misappropriation," which was also introduced and defined with the passage of the DTSA, means among other things, "disclosure or *use* of a trade secret of another without express or implied consent . . . ." *Id.* § 1839(5)(B) (emphasis added).

33

It is axiomatic that "[i]f a statute's text is 'plain and unambiguous, it must be given effect.'" *Christiana Tr. v. Riddle*, 911 F.3d 799, 806 (5th Cir. 2018) (quoting *BMC Software, Inc. v. C.I.R.*, 780 F.3d 669, 674 (5th Cir. 2015)). Here, the "use" of a trade secret would not be indictable under section 1832 because it is not one of the acts described in the statute. Likewise, "use" of a trade secret, though independently actionable under section 1836, is not a RICO predicate because it is not included in the definition of "racketeering activity" under section 1961. Therefore, ESPOT cannot rely on allegations that the MyVue Defendants are using its trade secrets, and will continue to do so, to establish an open-ended pattern of racketeering activity.

Similarly, ESPOT's allegations that the MyVue Defendants engage in mail and wire fraud when they send out tablets that contain ESPOT's trade secrets also fail to support future predicate acts. Sufficient allegations for wire or mail fraud include: "(1) the existence of a scheme . . . to defraud that (2) involves the use of the mails for the purpose of executing the scheme, and (3) the specific intent to commit fraud." *United States v. Aubrey*, 878 F.2d 825, 827 (5th Cir. 1989) (citing 18 U.S.C. § 1341); *United States v. del Carpio Frescas*, 932 F.3d 324, 329 (5th Cir. 2019) (wire fraud). To demonstrate a "scheme to defraud" there must be a "false or fraudulent material misrepresentation." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016) (quoting *United States v. Curtis*, 635 F.3d 704, 718 (5th Cir. 2011)) (internal quotation marks omitted). The statutes also require that the act allegedly amounting to wire or mail fraud be "part of the execution of the fraud or [be] incident to an essential part of the scheme." *United States v. Ingles*, 445 F.3d 830, 837–38 (5th Cir. 2006) (quoting

*United States v. Green*, 494 F.2d 820, 824 (5th Cir. 1974)) (internal quotation marks omitted).

ESPOT alleges that mail and wire fraud predicates will continue to take place in the future when a tablet, having been allegedly programmed with ESPOT's trade-secret intellectual property, is delivered to customers. ESPOT alternatively suggests that these instances amount to both fraud on the customer, (Dkt. #26 at 19), and fraud on ESPOT itself, (Dkt. #44 at 5). Neither theory amounts to a predicate act that threatens to continue into the future.

In addition to being unpleaded, ESPOT's suggestion that the delivery of tablets containing ESPOT's intellectual property constitutes a scheme to defraud MyVue's customers fails because there is no indication that MyVue makes any fraudulent representation to its customers regarding the ownership of the intellectual property. Moreover, even if it did, that a customer would find such a representation material seems unlikely. Accordingly, there is no scheme to defraud MyVue customers. Because ESPOT fails to plead a scheme to defraud MyVue's customers, this theory fails to allege a predicate act.

ESPOT's alternative argument that the process of delivering the tablets to MyVue customers amounts to ongoing mail and wire fraud against ESPOT itself is similarly unavailing. ESPOT claims that "Defendants have defrauded [ESPOT] by incorporating [its] trade secrets into MyVue's table devices." (Dkt. #44 at 5). However, this statement confuses the goal of the alleged RICO enterprise with the scheme to defraud. Although ESPOT alleges that the MyVue Defendants had a broad

35

plan to "steal" its business, the specific fraud complained of was a scheme to obtain ESPOT's intellectual property. Although ESPOT has adequately pleaded certain acts that, if true, amount to mail or wire fraud as they relate to obtaining the intellectual property at the center of this case, mailing the tablets as suggested in ESPOT's sur-reply does not implicate the use of the mail or wires to advance the scheme to fraudulently obtain any of ESPOT's property. As a result, ESPOT's allegations that the MyVue Defendants' criminal activity threatens to continue into the future fails as well. Having pleaded no activity that amounts to a predicate act that threatens to extend into the future, ESPOT fails to invoke an open-ended pattern as it must to survive a motion to dismiss.

### b. ESPOT's allegations are insufficient to demonstrate an open-ended RICO pattern.

As described herein, the thrust of ESPOT's argument for a pattern of racketeering activity is that once the MyVue Defendants took the trade-secret information from the ill-gotten tablets, they began using the trade-secret information in their own tablet product—leading to a new predicate act each time a new tablet containing the trade secret intellectual property is sent out. Unless and until the MyVue Defendants stop using the intellectual property in their tablets, ESPOT claims that the MyVue Defendants threaten to continue the criminal use of its trade secrets and wire/mail fraud indefinitely. But even if the acts alleged constituted RICO predicates, ESPOT's ability to maintain a RICO claim depends on whether the threatened continued acts are the type that may support a pattern of racketeering activity under an open-ended theory. They are not.

36

In support of its argument, ESPOT cites *Brand Energy & Infrastructure Services v. Irex Contracting Group* for the proposition that continuing use of a trade secret is sufficient to threaten repetition of the criminal conduct alleged.[7] *See* No. 16-2499, 2017 WL 1105648, at *12–14 (E.D. Pa. Mar. 24, 2017). In *Brand Energy*, several employees left the plaintiff company to join the defendant, taking with them equipment and trade secrets, which they used while employed with the defendant company. *Id.* at *1. The plaintiff claimed that the ex-employees' misappropriation of trade secrets "continues to this day." *Id.* at *2. The *Brand Energy* court found that allegations of continuing use of trade secrets alone were "sufficient to constitute a 'pattern of racketeering activity' under RICO." *Id.* at *12.

Other courts, however, have expressed doubt that this is the type of "ongoing use" activity, absent other acts of racketeering, that involves an open-ended pattern. *See, e.g.*, *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989) (holding that allegations that defendants copied software and then

---

[7] Though ESPOT cites to multiple cases in support of this proposition, (Dkt. #35 at 18), *Brand Energy* is the only one on point. All the other cases involve either additional allegations that the defendant(s) threatened to continue the actual theft of additional trade secret information or the allegations include predicate acts for a significantly longer period of time. *See DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 926 (S.D. Tex. 2019) (finding a pattern of racketeering activity when the defendant "illegally downloaded resumes from [the plaintiff]" on fourteen occasions over the span of nearly two years with "no evidence that [the defendant] would have ceased his illicit conduct"); *SolarCity Corp. v. Pure Solar Co.*, No. CV 16-01814-BRO (DTBx), 2016 WL 11019989, at *7 (C.D. Cal. Dec. 27, 2016) (finding a pattern of racketeering activity when defendant repeatedly provided new customer information); *Barlett v. Barlett*, No. 3:17-CV-00037-JPG-SCW, 2017 WL 5499403, at *6 (S.D. Ill Nov. 16, 2017) (finding a pattern of racketeering activity when defendants planned to continue taking "customer lists and information, financial data, borrowing and lending protocols, form loan applications, TILA disclosure forms, and ACH authorization forms" from the defendant's stores); *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *19 (E.D. Ky. Mar 26, 2019) (finding a pattern of racketeering when the fraud occurred over the span of six years).

used it did not "involve[] long-term criminal conduct or activity that could, in commonsense, be called a pattern of racketeering."); *Attia v. Google LLC*, No. 17-CV-06037-BLF, 2018 WL 2971049, at *18 n.15 (N.D. Cal. June 13, 2018) ("Plaintiffs' theory that 'ongoing use' of trade secrets can somehow constitute *two* predicate acts under RICO is entirely unsupported and illogical. . . . Accepting Plaintiffs' theory would turn a single trade secret misappropriation claim into a RICO offense every time a defendant violated the DTSA and then did not immediately stop their allegedly unlawful use of the trade secrets."); *Binary Semantics Ltd. v. Minitab, Inc.* No. 4:07-CV-1750, 2008 WL 763575, at *4 (M.D. Pa. Mar. 20, 2008) ("[T]he use of trade secrets is quite different from the initial act of stealing them . . . . If plaintiff's complaint were to allege that defendants would continue to steal plaintiff's trade secrets, as opposed to use those which have already been stolen, then there may well be a threat of continuity, but that is not the case here.") (collecting cases).

For the reasons discussed above, ESPOT fails to plead a "pattern of racketeering activity" sufficient to maintain a RICO claim. As a result, the RICO claim is DISMISSED for failure to state a claim upon which relief can be granted.

## B. RICO Conspiracy

Section 1962(d) permits a cause of action against anyone who "conspire[s] to violate any of the provisions of [RICO]." "To prove a RICO conspiracy, the [plaintiff] must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (quoting

*United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)) (internal quotation marks omitted). Because ESPOT has not plausibly alleged a pattern of RICO activity, those allegations cannot form the basis of a conspiracy claim. "[T]here can be no agreement to engage in a substantive RICO offense that does not exist." *Orthoflex, Inc. v. Thermotek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2012 WL 2864510, at *4 (N.D. Tex. July 12, 2012). The claim for RICO conspiracy must therefore be DISMISSED. *See id.* (dismissing a RICO-conspiracy claim when the underlying RICO claim failed); *Paul v. Aviva Life & Annuit Co.*, No. 3:03-CV-1490-B, 2010 WL 5105925, at *6 (N.D. Tex. Dec. 14, 2010) (same).

### III. Remaining Claims

Having dismissed the RICO claims, the Court returns to the Rule 12(b)(2) motion to dismiss the remaining claims because specific personal jurisdiction is a claim-specific inquiry. *Seiferth v. Helicopertos Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). ESPOT concedes that, without the RICO claims, the Court lacks personal jurisdiction over all the Individual Defendants except Clemente. *See* (Dkt. #44 at 7) ("[E]ven without ESPOT's RICO claims and the corresponding nationwide service of process, the Court may alternatively proceed against [Clemente, MyVue, and NexxGen]."). Therefore, the Court need only address personal jurisdiction on the remaining claims as to Clemente, MyVue, and NexxGen.

The remaining claims include misappropriation of trade secrets under the DTSA, violations of the CFAA, breach of fiduciary duty, conversion, aiding and abetting, and conspiracy. Of these remaining claims, ESPOT alleges only the

misappropriation-of-trade-secrets and CFAA claims against MyVue and NexxGen, while alleging all the remaining claims against Clemente. As described herein, *see supra* section II(A)(1)(ii) n.3, ESPOT must only make out a *prima facie* case for personal jurisdiction as to each defendant on each claim.

## A. Misappropriation of Trade Secrets

The owner of a trade secret may initiate a civil action against anyone who misappropriates the trade secret as long as the trade secret is related to a product or service in interstate commerce. 18 U.S.C. § 1836(b)(1). A person misappropriates a trade secret when the person uses improper means to acquire knowledge of a trade secret and then discloses or uses a trade secret without consent. *Id.* § 1839(5)(B)(i). Examples of "improper means" include theft, bribery, and misrepresentation. *Id.* §1839(6)(A).

### 1.  Joe Clemente

For the same reasons the Court has personal jurisdiction over Clemente on the RICO claims, the Court has personal jurisdiction over Clemente on the trade-secret-misappropriation claim. The "improper means" by which Clemente is alleged to have obtained ESPOT's trade secrets were directed at and occurred in Texas. Specifically, Clemente transmitted misrepresentations regarding his proposed use for ESPOT's tablets through text messages and a phone call to Valley, who was in Texas. These communications are at the heart of the misappropriation-of-trade-secrets claim because they are ultimately how Clemente obtained the trade secrets. The claim therefore arises out of sufficient minimum contacts between Clemente and Texas.

And because Clemente has failed to present compelling reasons why the Court's exercise of jurisdiction over him would be so unreasonable as to raise constitutional concerns, the Court has personal jurisdiction over Clemente on the misappropriation-of-trade-secrets claim.

### 2. MyVue and NexxGen

ESPOT has failed to meet its burden to establish that either MyVue or NexxGen has minimum contacts with Texas to justify exercising personal jurisdiction over them for misappropriation of trade secrets. Neither is incorporated in Texas, has offices in Texas, or has done any business in Texas, including the marketing, sale, or delivery of any product. (Dkt. #25 at 2). MyVue and NexxGen do, however, both have websites that allow potential users to click a link to obtain a free tablet. To do so, a user must fill out a form with personal information and agree to the terms and conditions. (Dkt. #45, Hr'g Tr. Vol. 2 217–18:4–12).

ESPOT contends that under *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997), the MyVue and NexxGen websites conduct activities that put them on the high end of the interactivity scale and thus subject them to personal jurisdiction in Texas for misappropriation of trade secrets. Recognizing the unique nature of contacts over the internet, *Zippo* provides a framework by which contacts with a forum over a website can be analyzed for their jurisdictional implications. *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (adopting the *Zippo* framework). Under that framework, websites can fall along three jurisdictionally significant points: at the low end is a "passive" website which

"does nothing more than advertise on the Internet" and for which personal jurisdiction is inappropriate; at the high end is a website that "clearly does business over the Internet by repeatedly entering into contracts" and for which "personal jurisdiction is proper." *Id.* (quoting *Zippo*, 952 F. Supp at 1124). In the middle are websites that "allow[] a user to exchange information with a host computer" and for which jurisdiction is "determined by the level of interactivity and commercial nature of the exchange of information." *Id.* Websites in this middle category lend themselves to a familiar contacts-based analysis. *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002).

Here, the MyVue and NexxGen websites are certainly not passive—both allow users to input their information and to agree to certain privacy policies, in theory, to receive a tablet. But they do not fall on the high end of the *Zippo* scale either because neither "involve the knowing and repeated transmission of computer files." *Zippo*, 952 F. Supp at 1124. A person can enter their personal information to have MyVue or NexxGen send them a tablet, nothing more. Thus, both appear to fall in the intermediate category because the websites allow individuals to interact with MyVue and NexxGen through their websites, but not in a repeated, continuous way. *See Mink*, 190 F.3d at 337 (declining jurisdiction when a website allowed customers to print out an order form and contact the company through an email address).

Although there appears to be a moderate amount of possible interactivity between the MyVue and NexxGen websites and users, there is no indication that any tablets have been ordered from or shipped to Texas. *See* (Dkt. #45, Hr'g Tr. vol. 2

156–57:21–6) (Valley's testimony that he did not know of anyone who had filled out and received a tablet or if one would actually be sent if the form was filled out); (Dkt. #25-6, Ex. B ¶¶ 12–18) (stating no tablets have been marketed towards or shipped to Texas). For a specific-jurisdiction analysis, the Court must look "only to the contact out of which the cause of action arises." *Revell*, 317 F.3d at 472. Here, ESPOT has failed to demonstrate any contacts between MyVue and NexxGen and Texas at all, much less any that can form the basis of a claim for misappropriation of trade secrets. Accordingly, it has failed to meet its burden to plead facts to make out a *prima facie* case for personal jurisdiction over MyVue and NexxGen as to the misappropriation of trade secrets claim. *See e.g.*, *Origin Instruments Corp. v. Adaptive Comput. Sys.*, No. 397CV2595–L, 1999 WL 76794, at *4 (Feb. 3, 1999) (holding no personal jurisdiction when there was no "evidence in the record to establish that Defendant ha[d] been interacting with anyone in Texas through its web site").

## B. CFAA, Breach of Fiduciary Duty, Conversion, Aiding and Abetting, and Conspiracy

ESPOT alleges the same contacts with Texas for each claim: the cell phone communications for Clemente and the maintenance of internet websites for MyVue and NexxGen. For the same reasons the websites do not create sufficient minimum contacts with Texas for the misappropriation-of-trade-secrets claim, they also do not do so for the CFAA claim. There is no evidence that MyVue or NexxGen have had contacts with Texas through their websites, and even if there was, the maintenance

of the websites is unrelated to the CFAA allegation. Accordingly, the Court lacks personal jurisdiction over MyVue and NexxGen with regard to the CFAA claim.

All the remaining claims against Clemente arise out of the same nucleus of facts: Clemente allegedly induced ESPOT's principals to ship him ESPOT tablets under false pretenses so that Clemente and others could access the tablets and extract the trade secrets contained in them. These allegations are at the root of each claim against Clemente.

When a court has personal jurisdiction over the defendant on one claim, the court can exercise pendent personal jurisdiction over the same defendant on all other claims arising out of the same nucleus of operative fact. *Rolls-Royce*, 576 F.Supp.2d at 783 (citing *United States v. Botefuhr*, 309 F.3d 1263, 1272–73 (10th Cir. 2002)). Concerns of fairness are significantly diminished when the defendant will already be in the forum defending against causes of action raising the same factual issues. *Id.* The Court will therefore exercise personal jurisdiction over Clemente on the remaining claims.

For the reasons stated above, the MyVue Defendants' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is DENIED as to the remaining claims for Defendant Clemente and GRANTED as to the remaining claims for all other defendants.

## IV. JURISDICTIONAL DISCOVERY

In its response to the motion to dismiss, ESPOT requests that the Court grant it leave to conduct limited jurisdictional discovery if the RICO claim is dismissed in

full. (Dkt. #35). Although the plaintiff bears the burden of establishing personal jurisdiction, courts should generally permit jurisdictional discovery when the plaintiff presents facts that suggest "with reasonable particularity the possible existence of the requisite contacts." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)). Here, however, ESPOT has failed to indicate the possible existence of contacts with Texas for any other defendants.[8] In fact, the record suggests that the other defendants' alleged actionable conduct had no connection to Texas. Accordingly, the Court declines to grant ESPOT leave to conduct jurisdictional discovery.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendants MyVue Media, LLC, NexxGen News LLC, David Drucker, Andrew Moskowitz, Kevin Carpentier, Joe Clemente, and Thomas Weddell's Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, to Dismiss, In Part, for Failure to State a Claim, (Dkt. #25), is **GRANTED in part** and **DENIED in part**.

The motion to dismiss for lack of personal jurisdiction as to all defendants on the RICO and RICO-conspiracy claims is **DENIED**. The motion to dismiss the RICO and RICO-conspiracy claims for failure to state a claim is **GRANTED**. The motion to

---

[8] ESPOT has suggested that it located certain social media posts indicating that NexxGen continues to advertise even though Defendant Drucker's affidavit says that it had ceased operations. One of the referenced posts appeared to be posted from Austin, Texas, although location information is entered by the user independent of actual location. Another post referenced a student from Keller, Texas. These posts, however, are unrelated to the contacts necessary to establish personal jurisdiction for ESPOT's misappropriation-of-trade-secrets and CFAA claims.

dismiss for lack of personal jurisdiction as to Defendants MyVue Media, LLC, NexxGen News LLC, David Drucker, Andrew Moskowitz, Kevin Carpentier, and Thomas Weddell on all remaining claims is **GRANTED**. The motion to dismiss for lack of personal jurisdiction as to Defendant Joe Clemente on all remaining claims is **DENIED**.

The RICO and RICO-conspiracy claims are hereby **ORDERED, ADJUDGED, and DECREED DISMISSED with prejudice**.

All remaining claims against Defendants MyVue Media, LLC, NexxGen News LLC, David Drucker, Andrew Moskowitz, Kevin Carpentier, and Thomas Weddell are hereby **ORDERED, ADJUDGED, and DECREED DISMISSED with prejudice** to refiling in Texas and **DISMISSED without prejudice** to refiling in any other jurisdiction.

**So ORDERED and SIGNED this 2nd day of October, 2020.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE